**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0355n.06

Case No. 13-4026

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 02, 2014
DEBORAH S. HUNT, Clerk

SVETLANA VELICHKO,                          )
                                            )
        Petitioner,                         )
                                            )    ON PETITION FOR REVIEW
v.                                          )    FROM THE UNITED STATES
                                            )    BOARD OF IMMIGRATION
ERIC H. HOLDER, JR., Attorney General,      )    APPEALS
                                            )
        Respondent.                         )
                                            )
                                            )

BEFORE: SUHRHEINRICH, ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Svetlana Velichko claims that the Board of Immigration Appeals mistakenly denied her application for withholding of removal and protection under the Convention Against Torture. No error occurred, and accordingly we must deny her petition for review.

A native of Russia and a citizen of Ukraine, Velichko entered the United States from Mexico at some point in early 2000. She allegedly paid a Ukrainian company to help her obtain a work visa and a temporary job in the United States. When she arrived in Mexico en route to the United States, though, company employees purportedly held her hostage for "about three to four weeks" to extort more money from her as well as from her brother who was living in the

United States. AR 384. What exactly happened to Velichko remains unclear. Her travel documents tell one story, and Velichko tells another.

The travel documents suggest that she traveled to Mexico to enjoy a vacation at the beach. Velichko's passport indicates that she left Ukraine on January 24, 2000 with a fifteen-day Mexican travel visa. A baggage-claim receipt confirms that she arrived in Tijuana, Mexico the next day. These dates correspond with those on her itinerary issued by the "International Tourist Agency." The itinerary says that, after arriving in Tijuana, Velichko planned to stay at the "Casa Del Sol" hotel in Baja from January 24 to January 31. These dates were also consistent with a travel insurance policy she purchased on January 14. It covered a ten-day trip to Mexico, lasting from January 24 to February 2.

According to Velichko's testimony, however, she didn't go to Mexico for pleasure. She stopped there temporarily before heading to the United States to get a work visa and a job. She stayed longer because the company hired to help her in this quest ended up holding her captive for almost a month.

When one examines the details of Velichko's account, the matter gets murkier. Take her arrival in Mexico. Velichko insisted in her asylum application and before the immigration judge that she was "certain" she left Ukraine on January 7. AR 235. But all of her official travel documents point to a later departure. Her passport shows that she left Ukraine on January 24, and her airline-issued baggage-claim receipt shows that she arrived in Mexico on January 25. All of her travel documents and plans—her visa, travel-insurance policy, itinerary—were issued in Ukraine several days after January 7, making travel on that date impossible. After finally coming to grips with these inconsistencies, Velichko's lawyer began his redirect by noting "it's

pretty clear that you didn't enter Mexico . . . [on] January 7." AR 240. At that point, Velichko changed her story. She "d[idn't] remember [the] exact date" of departure, it turned out, and "d[idn't] know" whether she left Ukraine on January 24. AR 240–41.

More inconsistencies emerged as Velichko tried to explain what happened during her alleged captivity in Mexico. She faltered on the price of the Ukrainian company's services, reducing it from $8,500 (in her asylum application) to $8,000 (during her testimony). She revised the threats that her captors made when demanding more money. According to her asylum application, the captors threatened to abandon her in Mexico and to allow Mexican gangs to kill her. According to her testimony, her captors threatened to force her into prostitution and to harm her children in Ukraine. Most significantly, Velichko could not present a cohesive account about the length of her ordeal. Velichko initially testified (repeatedly and with certainty) that her captors held her hostage for "exactly" three and a half weeks. AR 211. But when her travel documents narrowed the window of time she could have spent in Mexico to thirteen days, her tale changed. Her captors may not have held her hostage for three to four weeks, but they did keep her locked up for at least "three weekends." AR 241. When this too failed—a calendar revealed only two weekends between January 25 and her February 6 arrival in the United States—Velichko gave up altogether, acknowledging she was "not sure of anything." AR 242, 245.

Velichko's story continued to unravel when she recounted the details of her release. According to Velichko, her captors took her to the United States after they spoke with her brother and made him promise to pay them $4,000. According to Velichko's brother, no captors called him from Mexico (or from anywhere else for that matter); he spoke only to Velichko, and she called from Los Angeles, not Mexico. As Velichko tells it, her captors placed her on a plane

3

bound for her brother's home in Detroit within a day of receiving her $4,000 ransom in California. But her brother gave a different timeline, suggesting a week or even a month passed between his wire transfer of money and Velichko's arrival in Detroit. Velichko mentioned in her asylum application that the captors took her "together with one man" to the United States and later to "the airport with tickets to Detroit." AR 384. In court, though, Velichko testified that the captors took her "alone" to California and to the Detroit-bound flight.

Truth and fiction continued to collide as Velichko reached the last stage of her account. Her asylum application suggested that her ordeal concluded after she boarded the Detroit-bound flight. She explained that her captors "took [her and the man] to the airport with tickets to Detroit" and "told [both of them] to forget about everything [that had] happened in Mexico and L.A." AR 384. Her in-court testimony, though, claimed that, after arriving in Detroit, the captors continued to harass her and to demand additional money for two to three more years, meeting her in person twice, taking another $1,500 dollars and calling her brother's house repeatedly. Velichko's brother offered a third take on this coda: Yes, his sister received a visit and a few calls from the captors after she arrived in Detroit; but no, the harassment in fact ended within a month of her arrival, not two to three years later.

After listening to this testimony, the immigration judge denied Velichko's application for withholding of removal and relief under the Convention Against Torture because (among other reasons) he could not credit Velichko's story and her ever-shifting account of what had happened. Even after being asked by the immigration judge, Velichko opted not to request voluntary departure, recognizing that her Ukranian passport had expired and that she could not qualify without a valid travel document. *See* 8 C.F.R. § 1240.26(c)(2). The Board affirmed the

adverse credibility finding and refused Velichko's belated request to remand the case for a second look at the voluntary departure question.

Under the immigration laws, our government may not remove a non-citizen if she demonstrates that her "life or freedom" more likely than not "would be threatened" in her home country "because of . . . race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A), (C); *Pablo-Sanchez v. Holder*, 600 F.3d 592, 594 (6th Cir. 2010). The applicant may use testimony to make this showing but only if the testimony is credible. 8 U.S.C. § 1231(b)(3)(C); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii). The immigration judge, in the role of fact-finder, takes the lead in determining whether the applicant presented a credible story. In making this decision, the judge may consider "the totality of the circumstances . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Id.* § 1158(b)(1)(B)(iii). If substantial evidence supports a credibility finding, we must uphold it. *Dugboe v. Holder*, 644 F.3d 462, 472 (6th Cir. 2011).

Velichko's application and testimony included many inconsistencies—more than enough to substantiate the immigration judge's adverse credibility finding. Velichko never gave a coherent account of her ordeal in Mexico. She could not give a straight story about when it started: January 7 or January 24? What happened during her captivity: Threats of gang violence or threats of prostitution? A three-and-a-half-week ordeal or a thirteen-day one? A phone call to her brother or not? Or how it ended: Alone or with another man? After boarding the Detroit-bound flight or several years later? When offered a chance to explain these inconsistencies, Velichko did not get far. In some instances, she gave explanations that made no sense: She purported to tell the truth *both* when she claimed that her captors released her alone *and* when she claimed that they released her together with another man; she was released alone

because she and the man walked separately through the border checkpoint, but the two were released together because they took the same route from Mexico to Detroit at the same time. In others, she essentially gave up: She forgot to mention the continuing threats after the Detroit flight because she might not have "take[n] [the application] seriously" and "just miss[ed] it." AR 231. She forgot to mention the threat of prostitution in her asylum application due to a "lack of concentration" and "foolishness." AR 232. She "d[id]n't know" "[w]hy . . . all the tickets [were] consistent" with her January 25 arrival in Mexico, she "d[id]n't know" whether she actually arrived on that date, and she "d[id]n't know" whether she spent only thirteen days in Mexico. AR 237–38, 241. By the end of it all, she was "not sure of anything." AR 242. Neither was the immigration judge, which accounts for—and amply supports—the finding that she was not credible.

Velichko counters that inconsistencies in the "specific details" of her story may not support an adverse credibility finding. Petitioner's Br. 10. But this argument misapprehends the law and paints an inaccurate picture of the facts. As a matter of law, inconsistencies in specific details may support an adverse credibility finding in cases that post-date the REAL-ID Act, such as this one. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). As a matter of fact, Velichko's memory slipped on more than a few minor details. Inconsistencies indeed were one of the few constants in her testimony. She consistently failed to recall fundamental aspects of her experience, such as when it started, the threats she faced and whether she escaped alone or with another person.

In the absence of credible testimony, Velichko has no basis for showing that she faces a threat to her life or freedom in Ukraine. Nor can she show a risk of torture. The Board thus did not err in denying her application for withholding of removal and protection under the Convention Against Torture.

Velichko separately asks us to review the Board's decision not to reconsider her (waived) application for voluntary departure. We lack jurisdiction over the claim. 8 U.S.C. § 1252(a)(2)(B)(i); *see also Al-Najar v. Mukasey*, 515 F.3d 708, 716 (6th Cir. 2008). Although we may consider a constitutional issue or a legal question related to the denial of voluntary departure, *Alhaj v. Holder*, 576 F.3d 533, 536 (6th Cir. 2009), Velichko raised neither one here. She asks only that we weigh the evidence and decide whether she qualifies for relief under the statute, a request that runs into the jurisdictional bar.

For these reasons, we dismiss in part and deny in part the petition for review.